Casey, Oh. J.,
delivered the opinion of the Court.
The claimants, on the 25th day of July, A. D. 1855, entered into a contract with the Secretary of the Treasury, acting on behalf of the *150 United States, to build a custom-house at Buffalo, in the State of New York. The contract was made subject to plans and specifications annexed to and made part thereof. The United States afterwards directed the building to be enlarged by adding twenty-five feet to its length, and three feet to the height.
On the 7th day of April, 1856, they entered into a similar contract with the same officer to build a like structure at Oswego, in the same State, of the original size and plan of the Buffalo house. During the progress of the work the government directed several changes and deviations from the plans and specifications, in the materials used, and in the mode of dressing and laying the stone.
To recover the value of the extra work, and for the increased expense occasioned by the departures from the terms of the contracts, the claimants brought suit in this court. The case was heard before the reorganization of the court, and resulted in a report to Congress in favor of the claimants for the sum of thirty-six thousand four hundred and forty dollars and ninety-four cents, ($36,440 94.) On the 3d March, 1863, an act was passed increasing our finding to the sum of seventy-four thousand five hundred and eighty-three dollars and thirty-seven cents, ($74,583 37.)
In the contracts already referred to, it was stipulated on the part of the United States that for the custom-house at Buffalo they would pay to the claimants the sum of eighty-one thousand three hundred and forty-five dollars, “good and lawful money of the coin of the United Statesin the contract for the Oswego building, the sum of seventy-seven thousand two hundred and fifty-five dollars, in the same kind of money. And for the erection of these buildings various appropriations were made, the' last of which was for one hundred and ten thousand dollars, by the act dated 1st July, 1857; of which appropriations there remained unexpended at the time of the passage of the act for the relief of the claimants of the 3d March, 1863, over eighty thousand dollars.
On the 9th March, 1863, the claimants appeared at the Treasury Department and, by virtue of this act and the contracts upon which their claim was founded, demanded payment of the amount in the “lawful money of the coin of the United States.” The Secretary of the Treasury refused to accede to this demand, and offered payment in the legal-tender treasury notes of the United States, issued under the authority of the act of 25tli February, 1862. The plaintiffs received *151 these under protest, to the amount named in the act. To have made these notes equivalent to coin in the gold market of that day would have required the further sum, in treasury notes, of forty-three thousand six hundred and thirty-one dollars and twenty-six cents, ($43,631 26.) It is to recover this latter sum that they bring this suit, and they base their right to recover on the following grounds :
1. That the act of 25th February, 1862, authorizing treasury notes and making them a legal tender, is unconstitutional and void.
2. That by the express terms of the contracts they were entitled to be paid in “lawful money of the coin of the United States.”
3. That the appropriation out of which payment was directed to be made to them was enacted by Congress when gold and silver coin was the only money in the treasury, and they were entitled to the identical money so appropriated, or its equivalent.
The act of Congress authorizing treasury notes, and making them a legal tender, was approved the 25th February, 1862, and is entitled “An act to authorize the issue of United States notes, and for the redemption or funding thereof, and for funding the floating debt of the United States.”
The first section authorizes the Secretary of the Treasury “ to issue, on the ■credit of the United. States, one hundred and fifty millions of dollars of the United States notes, not bearing interest, payable to bearer at the treasury of the United States, and of such denominations as he may deem expedient, not les's than five dollars each. * *
“ Such notes herein authorized shall be receivable in payment of all taxes, internal duties, excises, debts, and demands of every kind due to the United States, except duties on imports, and of all claims and demands against the United States of every kind whatsoever, except for interest upon bonds and notes, which shall he paid in coin, and shall also be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid.”
I. The first question raised is, does Congress possess the power underthe Constitution, “ to emit bills of credit” and make them a legal tender in payment of all debts, public and private?
The claimants’ counsel contends that the only legal currency known to, or authorized by, the Constitution of the United States, is metallic coin. This,- it is argued, appears from—
1. The power expressly given to Congress “ to coin money and regulate the value thereof and of foreign coin;” and that this is the only *152 power conferred upon Congress in the Constitution to provide a currency.
2. It is a power which admits of no incidents, or choice of means. It is a single, specific act.
3. That the power must bo interpreted by the natural and common import of the words in which it is conferred.
4. That the Constitution is in nowise changed by a state of war. The power must be granted, or it cannot be exercised.
5. The words “coin” and “to coin” have a certain and fixed meaning. “Coin” is a piece of gold, or silver, or other metal, stamped by authority of the government, in order to fix its value, and is commonly called money; and “ to coin ” is to stamp metal,as money. The Constitution having used these terms, excludes all other kinds of money. Expressio unius est exclusio alterius.
6. The amendments to the Constitution also exclude any power to make a paper currency. This power not being expressly granted, its exercise is prohibited in express terms by article 10 Amendments.
7. The power cannot be inferred from that clause which prohibits a State from emitting bills of credit and from making anything but gold and silver coin a legal tender in payment of debts; for a prohibition to the States does not imply a grant to Congress.
8. A creditor of the government is entitled to present payment in money, not in promises to pay at a future time.
Such is a synopsis of the positions assumed by the claimants’ counsel on the leading question in the cause. It is a question of great and transcendent importance. Should these positions be sustained by the courts of the United States, it would in all probability involve the government in financial ruin, if not in hopeless bankruptcy. It would paralyze if not entirely arrest its efforts to suppress the rebellion now being waged against its Constitution and laws, for want of the necessary means to prosecute the war. It would equally destroy, for a time, trade, commerce, and private enterprise, and produce panic and prostration in every department of business. And a 11 this would be accompanied with the loss of character and credit both at home and abroad, and bring us national humiliation and disgrace before the civilized world.
In view of such consequences, an interpretation which will produce them should not be adopted unless constrained by overruling necessity.' And that any interpretation will produce great inconvenience and injury is always a reason for rejecting it, where any other reasonable *153 construction can be given which will avert them. The interpretation which we think would be followed by such injurious if not disastrous results, is professed to be made upon the plain, natural meaning of the terms of the Constitution. The declared objects of that instrument, however, are very different. “To form a more perfect union, establish justice, insure domestic tranquility, provide for the common defence, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity ” — these were the ends aimed at by the framers of that great political charter. But if we are compelled to construe it in such a way that, instead of securing these objects, it is to be the source of the evils and calamities we have mentioned, then both the Constitution itself as well as the system of government it proposed to establish are a failure and a delusion.
Is this the true construction ? Is the power to coin money confined strictly to a metallic currency ? This is a very narrow interpretation of the words as used. ' The words “ to coin” are defined by the best lexicographers, to stamp, to impress, to fabricate, or forge. And the word “ money,” both at the time of the adoption of the Constitution and since, was by no means confined to gold and silver, or any other kinds of metal. It was employed to designate anything authorized by the sovereign power of the state to be circulated as currency and used in the exchanges of trade and commerce.
At Hilary term, 31 Geo. 2, A. D. 175S, in the case of Miller v. Race, 1 Burrows, 457, Lord Mansfield held that bank-notes were money. In delivering the judgment of the court he says:
“Now, they are not goods, not securities, nor documents for debts, nor are so esteemed; but are treated as money, as cash, in the ordinary course and transaction of business, by the general consent of mankind, which gives them the credit and currency of money to all intents and purposes. They are as much money as guineas themselves arc, or any other current coin that is used in common payments, as money or cash.”
The same was held in 1 Salk., 126; Cowp., 200; Cumidge v. Allenby, 6 B. & C., 373, S. C.; 13 Eng. Com. L., 202. And this doctrine has been generally followed in this country. In the case of Hopson v. Fountain, 5 Humph., 140, the court says: “ Money is a generic term, and embraces every description of coin or bank-notes recognized by common consent as a representative of value in effecting exchanges of property or payment of debts.” In this case it was pressed upon the court that money was a technical term, meaning gold and silver coin. (Young v. Adams, 6 Mass., 182.) In the case of Bayard v. Shunk, *154 1 W. and S., 95, in the supreme court of Pennsylvania, bank-notes were held to be money. Chief Justice Gibson says : “ Our bank-notes are private contracts without public sanction, like that which gives operation to the lawful money of the country; but it is also true that they pass for cash both here and in England, not by force of any such sanction, but by the legislation of general consent, induced by their great convenience, if not the absolute necessities of mankind. See Northampton Bank v. Balliet, 8 W. and S., 317.
Many more cases might be cited to show that the most eminent and enlightened jurists and the highest courts have held and regarded that as money which the practice and common consent of mankind have treated as cash in the current exchanges of trade. The same usage and practice prevailed in colonial times, and under the confederation in this country. Such paper issues entered largely into the currency at the time of the formation of the Constitution. Every colony and every State had had its paper currency, and in many of them 'such issues had been declared legal tender. The history of the “ continental money” is familiar to all. These issues were not only all called money, but, what was more expressive and emphatic, they were passed off and used as cash in all departments of business and trade, and in the fiscal operations of the government itself. And from the condition of things then existing, it would have been not only injurious, but absolutely ruinous, to have, immediately upon the adoption of the Constitution, resorted to an exclusively metallic currency. Our best reason for believing that those who then administered the government, and had helped to form the Constitution, did not regard that instrument as restraining them to such a circulating medium, lies in the fact that they made little, if any, effort to shut out a paper currency.
For my own part, and speaking on this clause for myself alone, I would give to it a wider range and a more liberal interpretation. Taking the verb “to coin” in its general sense, as meaning to stamp, to impress, to fabricate, and the word “money” to denote everything that is used in current exchanges, and we have a clause empowering Congress to “stamp money,” to “impress money,” to “fabricate money,” and to regulate and determine its value. And Congress, acting upon this theory that money derives its business and current value from the law, from the “image and superscription” it bears, and not so much from the material of which it is composed, have, by a succession of legislation extending from 1792 to 1857, exercised the power of changing the standards used in the coinage of the country, *155 botli as to the weight and fineness of the metal. If they can debase the precious metals used in coin, or even substitute the baser metals for them, it is difficult to comprehend why any other material, even paper, might not be stamped, impressed, or coined, and thus be made lawful money, and represent the credit or sovereignty of the nation. Taking into view the history of the legislation of Congress, and the clause itself, I cannot admit that the power admits of no incidents or choice of means. As early as 1791 Congress incorporated the United States Bank, and made its’ notes a legal tender in payment of all debts due the government. The power of Congress to pass this law was canvassed with great ability by the first minds of the country, some of whom had helped to frame the Constitution. It was not only thoroughly discussed in Congress, but also in the cabinet of Washington, and the power of Congress sustained by Hamilton, in an argument which remains unanswered to the present day. The whole ground was again reviewed by Congress, and the cabinet of Madison, in 1816, and the power reaffirmed. And in 1819 this long-mooted point was definitely and; we think, finally put at rest, by the decision of the Supreme Court of the United States in the great case of McCulloch v. The State of Maryland, (4 Wheat.) — not more by the respect and authority due to the high tribunal itself, than by the luminous and incomparable opinion of its great Chief Justice.
So from 1812 down to the present time, covering a period of more than fifty years, and almost two-thirds of our national existence, Congress has, upon various occasions and emergencies, authorized treasury notes in all respects like these issued under the act of 1862, except that the legal-tender clause was restrained to debts due the . United States. And the right and power to do so has not only not been seriously disputed, but it has been sustained by eminent judicial authority. The question came before the circuit court of the United States for Massachusetts, at May term, 1819, Mr. Justice Story presiding, in the case of Thorndike v. The United States, (2 Mason, 1.) That eminent jurist says: “By the statutes under which treasury notes have from time to time been issued it is enacted that all such notes shall be receivable in payment to the United Stales for duties, taxes, and sales of public lands, to the fall amount of the principal and interest accruing due on such notes. It follows, of course, that they are legal tender in payment of debts of this nature due to the United States, and, by the very tenor of the acts, public officers are bound to receive them.” This uniform and continued usage through so great a period of our national history, sustained by the executive, *156 legislative, and judicial departments of the government, and acquiesced in and approved by the people, ought reasonably to settle the question, even in a country where everybody claims the right to dispute everything. (See 1 Story on the Const., § 408.) And with this record and history of the subject before me, and the construction given to the Constitution, I am unable to say that the power “to coin money” means only to stamp certain metallic pieces.
It is also contended that no such power can be inferred in Congress from the prohibition laid upon the States against coining money or making anything but gold and silver coin a tender in payment of debts. Yet we think, when that prohibition is taken in connexion with the power directly conferred upon Congress, that it is an argument in favor of the authority of the national legislature. The object of denying such a power to the States is very apparent. To secure anything like uniformity aud stability in the currency, it was necessary that its regulation and control should be confided to a single legislature. It was equally necessary to enable Congress to carry out .other great powers confided to it, such as the power to borrow money, regulate commerce, raise and support armies, and provide and maintain a navy; for these grants would have conferred but a naked and barren authority if the States might in practice have defeated their operation by establishing and introducing clashing and conflicting circulating mediums. If it had been intended to deny to Congress the- power to “ emit bills of credit, or make anything but gold and silver coin a tender in payment of debts,” the prohibition would have been repeated in terms; for in the same section are contained the prohibitions against the passage, by any State, of any bill of attainder, ex post facto law, or the granting of any title of nobility. And to exclude any inference or implication, by the denial of these powers to the States, that Congress might pass such laws, the interdictions are repeated in terms, as limitations on the powers of Congress. The omission of any such prohibition, therefore, in the one case, while it is direct and explicit in the other, leaves the inference strong, if not irresistible, that it was intended to confer the power upon Congress, as well as deny it to the States.
But it is not necessary to rest the warrant for the exercise of the power in question upon a, narrow view of the Constitution or any of its grants. In deriving it from the power- “to coin money and regulate the value thereof,” I have expressed only my own views. But we are disposed to place it on higher and broader ground, and give a *157 wider effect to the grants of this great instrument; and, in doing so, we consider that it expressly confers power—
“To lay and collect taxes, duties, imposts, and excises.”
“ To pay the debts and provide for the general welfare of the United States.”
“To borrow money on the credit of the United States.”
“To regulate commerce with foreign nations and among the several States.”
“ To coin money and regulate the value thereof and of foreign coin.” “To provide for the punishment of counterfeiting the securities and current coin of the United States.”
“To declare war;” “to raise and support armies;” “to provide and maintain a navy.”
“ To provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions.”
“To provide for organizing, arming, and disciplining the militia.”
“ To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or any department or officer thereof.”
It is from great powers like these, embracing and conferring the highest attributes and functions of sovereignty a government can possess or exercise, that the power in question is derived. We do not consider it necessary to take up each of these great substantive grants and show how the right to issue these notes might be inherent in or necessary to their exercise, but will refer to two or three of them.
To secure certain, safe, and prompt collection and transmission of the taxes, excises, and duties upon which the operations of the government depend, it is necessary there should be not only a currency, but that it should, as nearly as possible, he of equal value in every part of the country and in every State of the Union. The perils and vicissitudes of war always force the precious metals out of circulation to a great extent. The history of the wars in our own country, as well as the European conflicts, are proof of this. The Bank of England in such a period suspended specie payments for more than a quarter of a century, between 1797 and 1823. During all that time her lawful and almost her only currency was the paper money of her banks. It is true, indeed, that it was not actually made a legal tender by Parliament; yet such were the difficulties and restrictions interposed by law to prevent any person from obtaining or recovering any *158 thing else, that it virtually amounted to that without ihe express enactment. The same cause produced the same effect in our own country during the war with Great Britain, from 1812 to 1S15. All the banks were compelled to .suspend specie payments. The deficiency and want of a currency was supplied by a resort to large issues of treasury notes. The same system, more limited in amounts, was adopted during the Mexican war. And experience proves that, in the present condition and dependence of commerce and finance throughout the world, it is impracticable, if not entirely impossible, for any commercial nation to carry on a long, expensive war by a metallic currency alone. The perils of the times cause men either to hoard the precious metals or carry them abroad and invest their fortunes in foreign countries to escape the hazards and burdens of their own.
The drain from those causes, as well as the greater amount of currency needed to supply the wants of the government, must bo furnished by increased issues of moneyed institutions, or by a currency based on public credit. The first, being State institutions, and possessing only local credit and currency, would fail to supply the country what is needed — that is, a medium in which the revenues of the government could be collected and its expenditures disbursed, possessing equal credit and equal value all over the country; And this can only bo effected by issuing such a currency under the authority or upon the credit of the United States. And, without the power to provide and secure such a medium, the right to levy and collect taxes, &e., would, under the circumstances referred to, be fruitless and nugatory.
As a means ‘‘to borrow money on the credit of the United States,” its direct sanction may be found in the express grant of the Constitution for that purpose.
Each individual who takes from the government or comes into possession of a treasury note is, to that extent, and while he retains it, a holder of the loan of the United States. The power to borrow “ on the credit of the United States” gives express authority to Congress to pledge that credit in such way as they may deem best adapted to obtain the loan and secure the lenders. Why “the credit of the United States” may not as well be pledged in a treasury note as in a treasury bond or treasury certificate we are unable to comprehend. The power to borrow and to pledge the credit of the United States is given. That power Congress can exorcise — nay, it is the duty of Congress to exercise it — whenever the interests of the country require the expenditure of more money than the sources of revenue at com *159 mand supply. But in what way and manner shall this he done? We answer, in any way, not expressly forbidden in the Constitution, which Congress shall deem necessary and proper to carry the power to borrow into execution and fruition.
The right to borrow — the right to pledge the credit — are undisputed and indisputable. Now, why this mode of doing so should be prohibited, why this form of security should he forbidden, is among the things the objectors do not specify. For our part, we cannot see why Congress, in its discretion, could not select this mode as well as any other. And being within that right of choice, the power is undoubted, whatever any court might think of the policy of its .adoption or the wisdom of the choice.
While we are satisfied that the power to pass the act in question can he safely rested on either of the grants we have named — that is, to lay and collect taxes, &e., or to borrow money on the credit of the United States — we are equally sure that, as incident to the power of regulating commerce, or as a means of giving efficiency and effect to that grant, even if neither of the others existed, the authority might be upheld and sustained.
We can deduce the power equally from those express grants to declare war, to raise' and support armies, to provide and maintain a navy, to suppress insurrections, and repel invasion; for while we concede that “the language and meaning of the Constitution is not changed by a state of war, by external or internal convulsions, by the temper of the times, or the rise and fall of political parties,” as contended for in the argument, yet if it is intended and meant that a state of war, or a great and impending peril or imminent public danger, may or does not, in any case, authorize acts and measures for the public defence and safety which in a time of peace and security would not have been necessary and proper, we cannot give it our assent. On the contrary, we maintain that a state of war authorizes Congress to pass any law, adopt any measure, and devise any means, not actually forbidden by the Constitution, which will make the war effective and give success to the national cause.
We are equally confident that it is comprised in that great general summary of powers conferred in that clause which gives to Congress authority “to make all laws which shall he necessary and proper for carrying into execution the foregoing powers, and all other powers vested by the Constitution in the government of the United States, or any department or officer thereof.” If the power in question can and *160 may be used as a means to give effect to specific powers, and is not forbidden, it is then as clearly and as expressly conferred as any other in the instrument; for though not specific, it is, nevertheless, express. The choice of means, the right of selection and discrimination, are as clearly express grants as are those to borrow money, or to raise and support armies. Therefore, Congress, when it adopts and devises measures necessary and proper to enable it to lay and collect taxes, to borrow money, to raise and support armies, or execute any other specific grant, is acting as strictly within the limits of the power actually conferred by the Constitution as they are in passing a law to establish a uniform rule of naturalization.
But it is not our design to attempt anything more than to cito a few of the high authorities by which this view of the case is sustained. These authorities, however, are so clear, full,' and decisive, as to exhaust alike the argument and the illustration.
Mr. Justice Story, in his Commentaries on the Constitution, vol. 1, § 433, says: “In the interpretation of the Constitution, there is no solid objection to implied powers. Had the faculties of man been competent to the framing of a system of government which would leave nothing to implication, it cannot bo doubted that the effort would have been made by the framers of our Constitution. The fact, however, is otherwise. There is not in the whole of that admirable instrument a grant of powers which does not draw after it others not expressed, but vital in their exercise; not substantive and independent, indeed, but auxiliary and subordinate. There is no phrase in it which, like the articles of confederation, excludes incidental powers, and which requires that everything granted shall be expressly and minutely described.”
In Anderson v. Dunn, (6 Wheat., 225-6,) Mr. Justice Johnson, in delivering the opinion of the Supreme Court of the United States, says: “The idea is utopian that government can exist without leaving discretion somewhere. Public security against the abuse of such discretion must rest on responsibility and stated appeals to public approbation.” So in 2 Cranch, 358, The United States v. Fisher, the court upheld an act of Congress giving a preference to a debt due the United States from an insolvent over other creditor. In delivering the judgment of the court, Mr. Chief Justice Marshall says : “In the case at bar, the preference claimed by the United States is not prohibited; but it has been truly said that under a Constitution conferring specific powers the power contended for must be granted, or it cannot *161 be exercised. It is claimed under the authority to make all laws which shall be necessary and proper to carry into execution the powers vested by the Constitution in the government of the United States, or in any department or officer thereof. In construing this clause, it would be incorrect, and would produce endless difficulties, if the opinion should be maintained that no law was authorized which was not indispensably necessary to give effect to some specific power. Where various systems might be adopted for that purpose, it might be said with respect to each that it was not necessary, because the end might be obtained by other means. Congress must possess the choice of means, and must be empowered to use any means which are, in fact, conducive to the exercise of a power granted by the Constitution. The government is to pay the debt of the Union, and must be authorized to use the means which appear to itself most eligible to effect that object.” — (Ibid., p. 396; 1 Curtis, 506.)
In the great case of McCulloch v. The State of Maryland, (4 Wheat., 311,) in which the power of Congress to incorporate the Bank of the United States was contested, Chief Justice Marshall says : “ Although among the enumerated powers of government we do not find the word ‘bank’ or ‘incorporation,’ we find the great powers to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war, and to raise and support armies and navies. The sword and the purse — all the external relations, and no inconsiderable portion of the industry of the nation, are intrusted to its government. It can never be pretended that these vast powers draw after them others of inferior importance merely because they are inferior. Such an idea can never be advanced. But it may with great reason be contended that a government intrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation, so vitally depend, must also be intrusted with ample means for their execution. The power being given, it is for the interest of the nation to facilitate its execution.” — (Pages 407-8.)
In Martin v. Hunter, (1 Wheat., 304,) Mr. Justice Story says: “ The Constitution, like any other grant, is to have a reasonable construction according to the import of its terms; and when a power is expressly given in general terms, it is not to be restrained to particular cases, unless that construction grows out of the context expressly, or by necessary implication.”
We can add nothing to the force and cogency of the reasoning in these cases; they exhaust the whole argument. Every line and syl *162 lable of them which sustains the right of Congress to choose and adopt such means as may conduce to the execution of a given and admitted power are as applicable to the case in hand as they were appropriate to the causes in which they were uttered; and with the great case of McCulloch v. Maryland, standing for near half a century not only unreversed but unshaken, as the highest judicial interpretation that can be given to the Constitution, the question is not doubtful. In our judgment that case goes further than is required to sustain the power claimed here. In that case the power to create or incorporate a bank, and to confer upon it the power to issue notes and circulate them as money, was placed upon irrefragable grounds. Now, if Congress possessed this power, why may not the government do the same thing through and by its constitutional agents and officers ? If it can be done through this intermediate agency, why not directly by the government itself? The power to do the thing must all come from the same source. If Congress has not the power, they cannot confer it upon any one. If they have it, they may execute it in any manner or through any means not forbidden in the Constitution which they may deem necessary and proper for the purpose.
With the power to issue the notes established, the right to make them a legal tender follows as a matter of course. The objection and argument go to the whole power; if they fail as to the one, they necessarily fail as to the other also. If the interdiction to the States against any emission of bills of credit does not apply to Congress, neither does the other part against making anything but gold and silver coin a legal tender in payment of debts. If Congress has the power to issue these treasury notes to be circulated as money, there can be no doubt of their right to regulate their value in the exchanges of trade and the payment of debts. As we have already seen, Congress has, from the earliest period since the adoption of the Constitution, controlled and regulated the subject of legal tender. Foreign coin has in some instances been made such, and again been repealed. For fifty years treasury notes have from time to time been made a legal tender in payment of all dues to the United States — a right never seriously controverted, and fully sustained by one of the most eminent jurists of the country. If Congress deemed it necessary and proper to impress this quality upon these issues, in order to give them greater credit and currency with the public — in order to enable the government to lay and collect its taxes, to borrow money, to pay the debts of the Union, to raise and support its armies, to provide *163 and maintain its navy, to suppress a formidable and gigantic insurrection, to provide for -tbe common defence and general welfare — he •would be a bold jurist that, in view of the authorities we have cited, would undertake to either doubt or deny the authority of Congress in the premises. We have no hesitation in declaring, as our opinion, that the powers of Congress a're ample, and fully sustain this legislation in all its parts.
This whole question was recently before the Court of Appeals of the State of New York in the cases of the Metropolitan Bank and the Shoe and Leather Bank v. Henry H. Vandyck, and Lewis H. Meyer v. James J. Roosevelt. The majority of the court sustained the power of Congress to the fullest extent. The leading opinion, delivered by Judge Davies, is an able and exhaustive exposition of the whole question, and reflects much credit upon its author, as well as on the high court of which he is an honored magistrate.
We have given to this subject the most careful and deliberate examination and consideration of which we are capable. We have fully pondered and weighed tbe able and ingenious argument of the senior counsel of the claimants on this branch of the case, and have arrived at the conclusion that the act is clearly within the powers of Congress, and that it does not in any of its parts conflict with the Constitution of the United States.
The Constitution was ordained and established by the people of the United States in their sovereign capacity as a people. They intended, through and by it, to found a system of government, with all the powers necessary to regulate and control all matters of a general and national character. Though limited in its powers, it is sovereign and supreme within their scope. It possesses every attribute, ■power, and function necessary to maintain its authority and perpetuate its existence. And though true that the vicissitudes of peace and war, of security and danger, do not change the powers of the government or the grants of the Constitution, yet for every crisis that may come, for each emergency that may happen by human agency, or in the ordinary line of Providence, it has made ample provision. It was well characterized in the argument of the learned solicitor as “the miracle of the eighteenth century.” It is, apparently at least, as ex-haustless and unfailing in its capabilities and powers, and their complete and perfect adaptation to every time, occasion, and circumstance', as was the miraculous supply of meal in the barrel and oil in the cruse of the widow of Zarephath. And while to the strict, technical *164 constructionist it may present a bleak and barren aspect, yet under the benign interpretation of our Supreme Court,.guided by the incomparable mind and genius, of Marshall, like the rock in the wilderness when smitten by the prophet’s rod, it sends forth its pure, ample streams to benefit and bless the nation.
II. The claim made for payment in coin, or its equivalent, is rested on the clauses in the contracts for building the Buffalo and Oswego custom-houses, which stipulated that the payment should be in “ good and lawful moneys of the coin of the United States.” A reference to the briefs and opinions in this case, when it was originally before this court on the question of damages, will show that the main contest then was whether there had been such an entire and total abandonment of the contracts as would justify the court in putting them out of view altogether, and allow the plaintiffs to recover for the whole work, as on a quantum meruit; or whether the contracts were to govern, so far as they could be traced, and so far as the work was done under them, and the claimants be allowed only to recover the-value of the work outside the contract and the cost and expenses of any changes made. A majority of the court ruled the cause distinctly on the latter ground. All the work which had been done under the contracts had been paid for. Nor was the suit founded on them. They were given in evidence only as inducement to the action, and not as the ground of recovery. The suits were founded upon verbal and implied contracts growing out of the orders and directions of the Secretary of the Treasury and the agents of the United States in charge of the work. The work, therefore, being outside of the contracts, none of their special provisions and stipulations were applicable to the case.
But, in any event, the debt or claim, whatever it was, merged in the report or judgment, the amount of which the claimants were entitled to receive in whatever was lawful money and legal tender at the time it fell due and payable. The report of the damages in this court was made on the 5th of May, 1862, after the passage of the act authorizing treasury notes, and a payment in that currency would, we think, have discharged the debt. (6 Allen’s Mass., 516; 3 Conn. Rep., 58.)
But what makes the case still stronger against the claimants, in our opinion, is, that being dissatisfied with our views and the principles upon which we assessed and by which we measured the damages, they induced Congress to reverse our finding and assess their damages on a quantum -meruit. This gave them more than double the amount *165 they were entitled to under the rule of damages fixed by the court. But it also put the contracts entirely out of the case. The allowance by Congress had no reference to these contracts whatever, and was based upon the assumption that they had been entirely abandoned and repudiated by the parties. This being so, and having been adopted at their own instance, they cannot now set them up as still ruling and governing the case. They cannot repudiate them for one purpose and affirm them for another. Having received their allowance from Congress on the allegation that the contracts were defifnct, they cannot now exhume them in order to claim a benefit under them.
It is, therefore, unnecessary for us to decide what would be the effect of contracts to pay in coin, or how and as to what extent they would be affected by the intervening act of Congress making treasury notes a legal tender. The case is not within the contracts, and the point, therefore, does not and cannot arise.
III. But the claimants contend that the act for their relief, passed on the 3d of March, 1863, makes the amount payable out of the unexpended appropriation made in 1857 for the completion of the Buffalo and Oswego custom-houses. The argument is that the only lawful money at that time was gold and silver coin; and it having been then appropriated by law, they are entitled to the identical money set apart for them by this appropriation; and that the latter appropriation is in the nature of an order or draft on the fund, operating as an equitable assignment of it to them. This position and argument are predicated, we think, on a misapprehension of the nature and effect of a legislative appropriation of money for any designated purpose, as well as of the usages of the Treasury Department upon the same subject.
An appropriation does not separate the amount of money named in it, and set it apart from the balance of the government funds, so as to keep the identical money for the specific purpose for which the appropriation was made. Appropriations are sometimes made of vast sums when there, is but a small sum in the treasury. It would be almost impossible to find money enough of any kind to carry out this idea of the claimants. For, if all the outstanding and unexpended appropriations had to he hoarded and kept separate and distinct from all other public money, it would require vast sums, and be alike injurious and inconvenient to the government and the people.
The only effect of an appropriation by Congress is to make it lawful for the officer charged with the business to which it relates to apply so much of any money as may be in the treasury at the time *166 to that specific object. It is not the identical money, but the specific sum, that is appropriated in such cases. And by the very terms of the law under which it is claimed it was payable out of “any money in the treasury not otherwise appropriated.” Nor was it payable until it was due and demandable, and that was not until after the 3d March, 1863. The only money in the treasury then, so far as wo know, applicable to this claim were treasury notes. These were lawful money, and in these the debt was paid. This was a good payment, both in kind and amount, and the claimants have no legal or equitable claim on the United States for anything more.
Mr. B.S.Ohatfield and Mr. Charles B. Sedgwick for claimants.
Mr. Bingham, United States Solicitor, and Mr. Weed, Assistant Solicitor, for the government.
We therefore find in favor of the defendants, and direct judgment to be entered accordingly.
Boring, J., dissented.